**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Michael P. Daly,

      Plaintiff,

      v.

New York Life Ins. Co.,

      Defendant.

Case No. 1:12cv125

Judge Michael R. Barrett

## OPINION & ORDER

This matter is before the Court upon Defendant New York Life Insurance Company's Motion for Summary Judgment. (Docs. 43 & 44). Plaintiff Michael P. Daly filed a Response (Doc. 63) and Defendant filed a Reply (Doc. 67).

### I. BACKGROUND

Plaintiff Michael Daly became an insurance agent for Defendant New York Life in 1988. (Doc. 44, Benjamin Field Decl., Ex. 1). As an independent contractor, Daly sold New York Life's life insurance products, but was eligible to sell competing products from other companies. (Field Decl., Ex. 1). In 2002, Daly discovered a means by which credit unions could potentially invest money in a single-premium "paid up additions rider" to whole life policies without incurring a tax penalty. (Doc. 62, Michael Daly Dep. at 329, 334-35). This rider to the whole life policy is called the Option to Purchase Paid Up Additions ("OPP Rider"). (Doc. 44, Field Decl., Ex. 2). It allows policy owners to purchase additional insurance above the death benefit of the base whole life policy by paying additional premiums ("OPP premiums"). (Id.) Because of their tax status as nonprofit institutions, credit unions were able to deposit large amounts into the OPP

Rider to take advantage of above-market, guaranteed minimum rates of return without the risk of penalties or adverse tax consequences if they later decided to withdraw cash values. (Daly Dep. at 334-35; Doc. 53-1, Ted Mathas Dep. at 158-160).

Daly shared his idea with New York Life. (Daly Dep. 336-341). New York Life agreed to accept OPP premiums in excess of the limit stated in the OPP Rider, which was 100% of the amount of the annual base premium, or a 1:1 ratio. (Field Decl., Ex. 8). Daly then began to market New York Life's whole life policies to credit unions. (Daly Dep. at 329, 334). Between 2003 and 2011, there was explosive growth in the use of New York Life's OPP Riders. Daly's credit union customers used the OPP Rider to "dump in" premiums that were often 100 times greater than the annual base premium, or a 100:1 ratio. (Field Decl., Ex. 8).

Daly claims that as New York Life's top premium producer, he was welcomed into New York Life's inner circle. Daly was named Chairman of New York Life's Advisory Board of Directors, a group which was reserved for top producers. (Daly Dep. at 40). Daly also had access to top management, including Theodore "Ted" Mathas, the Chairman of the Board. In email dated March 27, 2009, Mathas states:

> Mike -- really appreciated your note and your continued strong support of this company and our policyholders. I'd like to find some time to get your perspective on the environment and brainstorm some ideas with you. Do you have any trips planned to the NY area we could arrange phone call if our travel schedules don't match.
>
> Very best regards,
> Ted

(Mathas Dep., Ex. 59).

Daly explains that in 2010, New York Life proposed changes to the credit union whole life product, which Daly believed would discourage new business. Daly sent an

2

email to Mathas and Mark Pfaff, Executive Vice President, U.S. Life Insurance & Agency for New York Life, on April 9, 2010:

> Can I have a brief phone call with the 2 of you ASAP. I do not have a New York Life Product that is viable after June 9. I am going to copy you on what I send to your guys. I need to expand my supplier network for the first time in my career. I am OK with that and want you to be as well. Life Product thinking seems very out of touch. This is sent from my private email that I see right away.

(Mathas Dep., Ex. 60). Mathas and Pfaff were aware that without a resolution, there was a possibility that Daly would move his business to a competitor. In an email from Pfaff to Mathas on May 27, 2010, Pfaff informed Mathas:

> By the way . . . [Daly] mentioned to Gerard today that he was looking at M-Group as an alternative to our OPP issues if we can't work it out.

(Mathas Dep., Ex. 62). Later, in September of 2010, Michael Gordon, Senior Vice President, Agency – Life Operations for New York Life, sent an email:

> I just had a great conversation with Mike Daly.
>
> He is aware of (and supportive of) our plans to make the change in the second half November.
>
> He remembered the targets he gave us and
>
> he was appreciative that we hit them.
>
> I promised to get him the ability to illustrate it in advance of the rollout so he can continue to have initial meetings with clients and so his business is not interrupted, which we will do through CAT.
>
> I asked him to keep it confidential that we would do so.
>
> Michael

(Doc. 59, Paul Pasteris Dep., Ex. 16).

Starting in 2011, New York Life began to have a number of concerns about the increased use of OPP premiums by credit union customers, including the risk that if

3

interest rates were to rise, credit unions would liquidate the cash value created by the OPP premiums and seek better returns elsewhere. (Field Decl., Ex. 5). Some executives also had a concern that the use of OPP premiums for investment purposes was contrary to New York Life's purpose as a life insurance company. (Mathas Dep. at 158-59). As a result, in December of 2010, New York Life created a working group to consider strategies to keep OPP premiums as an attractive feature for ordinary buyers of life insurance while reducing the risk of overutilization. (Field Decl. Exs. 15). In February of 2011, a team was put together to re-price large OPP dump-ins. (Field Decl. Exs. 17 & 18). Daly was a member of the OPP re-pricing team. (Id.)

Daly discussed the re-pricing issue with New York Life executives. In a March 25, 2011 email to Daly, Michael Gordon stated:

> Mike –
>
> I am glad we got a chance to talk today. I think we covered a lot of important ground.
>
> I know this process has been difficult, and we recognize that these recent and ongoing changes have significant implications for your business. Even though we believe that these new corporate risk management measures are important for the company and its policyowners, we very much want to work with you to mitigate the impact to your business as much as possible.
>
> Based upon our conversation this morning, I think there are three types of additional Options to Purchase Paid Up Additions ("OPP") planned payments that would take an individual decision maker over our $10 million cap:
>
> - Category 1. Those cases where you already have a pre-approved OPP form from underwriting.
> - Category 2. Those cases where you were anticipating getting a pre-approved OPP form from underwriting in the near future.
> - Category 3. Those cases that are in process but where the actual payments are a little further off into the future.

4

> To summarize where we stand today, we are not in a position to take any additional payments that will lead any clients, on a cumulative basis, to have more than $10 million in OPP with us.
>
> With that said, and **without making any promises**. we are sensitive to the idea that we have forms outstanding for the people in Category 1, we are deeply sympathetic to the situation created by the cap, which was put in place after those forms were issued, and we plan to engage with people internally to see if we can exceed the cap in these specific instances. We cannot promise anything but we think there is a strong argument in favor of this direction, and we will seek to resolve the situation as quickly as possible.
>
> In terms of Categories 2 and 3, we can provide pre-approval forms that cover medical underwriting, but will do so only for amounts that would bring the cumulative OPP contributions for an individual decision maker up to the $10 million cap.
>
> In addition, we are very much open to having any conversations that you believe will help you in your business - including with clients - as well as any conversations that will help other agents. Most immediately, we are looking forward to talking to you and your partners after Brian returns from his vacation.
>
> This issue is difficult, but I feel as if we will work through it together - and I am hopeful that we will continue to work together to grow our mutual business for many years to come.
>
> Have a great weekend!
>
> Michael

(Field Decl. Ex. 27) (emphasis in original).

In June of 2011, the OPP team made recommendations, including additional caps on the amount of OPP premiums that would be accepted and reducing the amount of commissions paid to agents. (Field Decl., Ex. 20, Daly Dep. at 254).

On August 1, 2011, Daly informed his credit union customers that New York Life intended to make changes to the OPP Program on September 1, 2011 and customer could lock into the current rate by signing paperwork before August 31, 2011. (Field

Decl., Exs. 28 & 29).

In the meantime, changes in the financial markets increased the risk that credit union customers would "dump" more into the OPP premiums. (Daly Dep. at 264-265; Field Decl., Ex. 23). There was a sense of urgency when on August 17, 2011, New York Life's senior management decided to cap the premiums which could be paid into an OPP Rider to $2 million and limit premiums to ten times the amount of the annual base premium, or a 10:1 ratio. (Field Decl,, Exs. 8, 21). On August 18, 2011, these changes were explained to Daly and other agents in a telephone conference. (Field Decl., Ex 22). The changes were to be effective September 1, 2011. (Field Decl., Ex. 23). However, on August 23, 2011 New York Life notified Daly and the other affected agents that the $2 million cap and the 10:1 ratio would not apply to policies which had a certain pre-approval for payments or had been submitted before August 18, 2011. (Field Decl., Exs. 24, 25). Daly explains that these changes effectively ended his business.

After this Court's ruling on NYL's Motion to Dismiss, Daly's remaining claims are promissory estoppel, breach of fiduciary duty and defamation.

## II. ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of

production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

### B. Promissory estoppel

"Under Ohio law, the 'elements of a promissory estoppel claim are (1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise.'" *Sweitzer v. American Express Centurion Bank*, 554 F.Supp.2d 788, 796 (S.D.Ohio 2008) (quoting *Weiper v. W.A. Hill & Assoc.*, 104 Ohio App.3d 250, 661 N.E.2d 796 (Ohio Ct. App. 1995)).

New York Life argues that Daly has not identified "a clear unambiguous promise" which would support a claim for promissory estoppel. Daly responds that New York Life made a variety of promises over a period of years, but also made explicit promises about its planned changes to the OPP program.

As one example of a promise, Daly cites the January 29, 2011 email from Michael Gordon to Daly (with others copied):

> We will work with Mike [Daly] on the design of the new product, and make every effort to make it as compatible as possible with his business. Mike will be a part of the pricing team and will actively participate in the design.

(Pfaff Dep., Ex. 79). This statement does not make any clear and definite commitment to take or refrain from taking any particular action. At most, New York Life promised to "make every effort."

In addition, New York Life's words and actions in the months that followed this

7

email do not provide a sufficient legal basis for promissory estoppel. The course of events between January and September 2011 undercut Daly's claim that the business relationship between the two parties created a promise that New York Life would somehow protect Daly's business from its planned changes to the OPP program:

- In February of 2011, Daly was made part of a team which was tasked with re-pricing large OPP dump-ins.

- On February 28, 2011, New York Life announced that the cumulative premiums that could be paid into an OPP Rider would be capped at $10 million per household or entity.

- In a March 25, 2011 email from Michael Gordon, Daly was told that "we are not in a position to take any additional payments that will lead any clients, on a cumulative basis, to have more than $10 million in OPP with us."

- In June of 2011, the OPP re-pricing team recommended changes, including caps on the amount of OPP premiums.

- On August 1, 2011, Daly informed his credit union customers via email that New York Life intended to make changes to the OPP Program on September 1, 2011.

- On August 18, 2011 New York Life held a telephone conference with Daly and other agents, and informed the agents that there would be a $2 million cap on the premiums which could be paid into an OPP Rider and premiums would be limited to ten times the amount of the annual base premium, or a 10:1 ratio. The agents were told the changes would be effective September 1, 2011.

This evidence illustrates that Daly knew that New York Life planned to make changes to the OPP Rider which would affect his credit union customers. While Daly resisted the changes, there is no evidence that New York Life promised that it would not make the changes, or that Daly's business would be excluded from the changes. Therefore, New York Life is entitled to summary judgment on Daly's claim for promissory estoppel.

## C. Breach of fiduciary duty

New York Life argues that there was no fiduciary relationship or duty between itself and Daly. Daly claims that there was a fiduciary relationship, and as a result of the trust and confidence he placed in New York Life, he passed up other business opportunities.

The Ohio Supreme Court has defined the term "fiduciary relationship" as one "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Hope Acad. Broadway Campus v. White Hat Mgt., L.L.C.*, 145 Ohio St. 3d 29, 40-41, 46 N.E.3d 665, 676 (Ohio 2015) (quoting *In re Termination of Emp. of Pratt*, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974)). In determining whether a fiduciary relationship has been created, "the main question is whether a party agreed to act primarily for the benefit of another in matters connected with its undertaking." *Id.* (citing *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (Ohio 1988)). "Such a duty may arise from a confidential relationship in which one person relies on and trusts another and in which the relationship is not necessarily legal, but may be moral, social, domestic, or personal." *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 220 (6th Cir. 1992) (citing *Indermill v. United Savings*, 5 Ohio App.3d 243, 451 N.E.2d 538, 541 (Ohio 1982)).

However, "under Ohio law, there is generally no fiduciary relationship between an independent contractor and his employer unless both parties understand that the relationship is one of special trust and confidence." *Id.* at 145 Ohio St. 3d 49, 46 N.E.3d 682 (Kennedy, J., dissenting) (quoting *Schulman v. Wolske & Blue Co., L.P.A.*, 125

Ohio App.3d 365, 372, 708 N.E.2d 753 (Ohio Ct. App.1998). Therefore, a fiduciary relationship cannot be created by the principal alone. *Id.* (citing *Stone v. Davis*, 66 Ohio St.2d 74, 78, 419 N.E.2d 1094 (Ohio 1981) ("A fiduciary relationship need not be created by contract; it may arise out of an informal relationship where both parties understand that a special trust or confidence has been reposed.")). Whether a fiduciary relationship exists is a question of fact dependent upon the circumstances in each case. *Lippy v. Soc. Natl. Bank*, 100 Ohio App. 3d 37, 45, 651 N.E.2d 1364, 1369 (Ohio Ct. App. 1995); *Taylor v. Shields*, 64 O.L.A. 193, 196, 111 N.E.2d 595, 597 (Ohio Ct. App. 1951).

The Court concludes there is sufficient evidence to create a genuine issue of material fact as to whether the parties entered into a mutual fiduciary relationship. New York Life sought Daly's opinions and placed special trust and confidence in him because of his allegedly superior knowledge when it came to selling policies to credit unions. New York Life was also reliant upon Daly to maintain relationships with the credit union customers. In the January 29, 2011 email from Michael Gordon to Daly, Gordon states: "In addition, Mike has offered to introduce us to his largest clients (CEOs of Credit Unions) and to facilitate New York Life developing some direct relationships with them, so the company can gain comfort that the clients' intent is to hold these policies for the long term." (Pfaff Dep., Ex. 79). In an email dated August 18, 2010, Mathas told Daly that:

> I want to make sure you know I have no bad feeling from our engagement at our recent meeting.
>
> I think we've reached a new position of clarity and strength through our collective efforts and collective wisdom.

> I appreciate your significant contribution to this improved level of understanding.

(Mathas Dep. Ex. 67). Daly then responded:

> Mutual – would like to have a private heart to heart with U some time. Whenever I try to read the unspoken I misread. I treat the trust from NYLife & client as a Sacred duty & need to execute as close to perfect as possible. Scary if I feel I am flying blind.

(Mathas Dep., Ex, 67). These statements are sufficient evidence at this stage of the proceedings that New York Life had a special confidence and trust in the "integrity and fidelity" of Daly. Therefore, New York Life is not entitled to summary judgement on Daly's claim of breach of fiduciary relationship.

### D. Defamation

In Ohio, defamation is defined as "a false written publication, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1289 (Ohio 1995).

New York Life argues that Daly has not identified a defamatory statement made by New York Life. Daly responds that he is bringing a claim for defamation per quod.

As this Court has explained: "Defamation per se occurs when material is defamatory on its face; defamation per quod when material is defamatory through interpretation or innuendo." *Konica Minolta Bus. Sols., U.S.A., Inc. v. Allied Office Prod., Inc.,* 724 F. Supp. 2d 861, 870 (S.D. Ohio 2010) (quoting *Gosden v. Louis*, 116 Ohio App.3d 195, 687 N.E.2d 481, 488 (Ohio Ct. App. 1996)). In order to state a claim for defamation per quod in Ohio:

> the plaintiff must allege special damages. *Sheppard*, 203 N.E.2d at 509. Special damages are damages beyond a stained reputation; they are "those direct financial losses resulting from the plaintiff's impaired reputation." *Hampton v. Dispatch Printing Co.*, No. 87AP–1084, 1988 WL 96227, at *2 (Ohio Ct.App. Sept. 13, 1988).

*McGee v. Simon & Schuster, Inc.*, 154 F. Supp. 2d 1308, 1315 (S.D. Ohio 2001). "Nor may a jury 'lawfully compensate the plaintiff for pain, mental anxiety, or general loss of reputation, in cases where the words are not actionable themselves, but must confine the assessment to the actual pecuniary loss strictly as alleged and proved.'" *Id.* (quoting *Elec. Furnace Corp. v. Deering Milliken Research Corp.*, 383 F.2d 352, 356 (6th Cir.1967).

Daly argues that the most glaring damage to his reputation came from New York Life's unprecedented scrubbing of Daly's name from the organization after the OPP changes took place—disinviting him to the annual Chairman's Council meeting and Honor Dinner, taking back his awards for being New York Life's top premium producer and first in commissions, and removing an article about him being ABD Chairman from the company's NYLIC Review magazine. (Daly Dep. at 39-41). Daly explains that these actions created the impression that Daly was persona non grata and impaired his ability to transition to a new company. The Court finds that through innuendo, this evidence is sufficient to create a genuine issue of material fact as to whether these actions by New York Life affected Daly adversely in his "trade, business or profession." *Accord Kanjuka v. MetroHealth Med. Ctr.*, 2002-Ohio-6803, ¶ 20, 151 Ohio App. 3d 183, 193, 783 N.E.2d 920, 928 (Ohio Ct. App. 2002) (reversing grant of directed verdict and explaining that "the jury could have found actionable defamation per quod in the statements regarding depression or tardiness if they attributed Kanjuka's alleged

resignation, or tardiness or difficulty coming to work, to her depression).  Therefore, New York Life is not entitled to summary judgment on Daly's claim of defamation.

### III.     CONCLUSION

Based on the foregoing, Defendant New York Life Insurance Company's Motion for Summary Judgment (Doc. 43) is **GRANTED in PART and DENIED in PART**.

**IT IS SO ORDERED.**

                                      */s/ Michael R. Barrett*
                                 JUDGE MICHAEL R. BARRETT