**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Michael P. Daly,

    Plaintiff,

v.

New York Life Ins. Co.,

    Defendant.

Case No. 1:12cv125

Judge Michael R. Barrett

## FINAL JUDGMENT & ORDER

This matter came on for a Bench Trial on August 7, 2018, August 8, 2018 and August 9, 2018 and, thereafter, the parties filed their Proposed Findings of Facts and Conclusions of Law. (Docs. 101, 102).

### I. BACKGROUND

Plaintiff Michael Daly became an insurance agent for Defendant New York Life Insurance Company in 1988. (Doc. 96, Day 1 of Bench Trial, Tr. 80). New York Life is a mutual insurance company, which means that it is owned by its 3 to 4 million policyholders. (Doc. 96, Tr. 214). As an independent contractor, Plaintiff was able to sell Defendant's life insurance in addition to insurance policies written by other companies. (Doc. 97, Day 2 of Bench Trial, Tr. 67). Initially, Daly focused on selling New York Life whole life insurance policies to business owners and high net worth individuals. (Doc. 96, Tr. 80; Doc. 97, Tr. 33). Between 1992 and 2011, Daly was one of New York Life's top-producing agents. (Doc. 96, Tr. 80-82). During this time, Daly performed at the Chairman's Council level, which consists of the 250 top-producing agents for the previous year. (Doc. 96, Tr. 80). Daly was named Council President in 2005. (Doc. 98, Day Three,

Tr. 7-8). As a result of this success, Daly was invited to attend and participate in various "council" meetings and to sit on New York Life's Advisory Board of Directors ("ABD"). (Doc. 96, Tr. 80, 91). The ABD is comprised of past Council Presidents that are performing at the Chairman's Council level. (Doc. 96, Tr. 91). The ABD averaged about sixteen agents. (Doc. 96, Tr. 91). Ted Mathas, New York Life's CEO, testified that he "regularly" interacts with top agents on the Chairman's Council, President's Council, Executive Council, and Advisory Board of Directors. (Doc. 97, Tr. 69-70). Mathas explained that agents will often visit him in his office in New York, call him or email him. (Doc. 97, Tr. 70). Mathas explained that it was not uncommon for him to reach out to agents like Daly and invite dialogue. (Doc. 97, Tr. 84). In turn, because of his status, Daly did not follow the usual chain of command, and had access to New York Life's top executives when he needed it. (Doc. 96, Tr. 91-92).

In 2002, Daly discovered an opportunity for selling New York Life insurance products to credit unions. (Doc. 96, Tr. 82). Daly studied the regulations which applied to credit unions along with the applicable IRS regulations. (Doc. 96, Tr. 83). Daly then began developing the concept of a single-premium whole life insurance product which permitted a credit union to invest money through a "paid up additions rider" without incurring a tax penalty. (Doc. 96, Tr. 111-112, 147). This rider to the whole life policy is called the Option to Purchase Paid Up Additions ("OPP Rider"). (Doc. 96, Tr. 147). It allows policy owners to purchase additional insurance above the death benefit of the base whole life policy by paying additional premiums ("OPP premiums"). (Id.) Because of their tax status as nonprofit institutions, credit unions were able to deposit large amounts into the OPP Rider to take advantage of above-market, guaranteed minimum rates of return

without the risk of penalties or adverse tax consequences if they later decided to withdraw cash values. (Id.) Daly worked with New York Life's top management to develop and approval of the OPP Rider concept. (Doc. 96, Tr. 83-84, 92). Once it was approved by credit union regulators, Daly began selling the product in 2003. (Doc. 96, Tr. 84-88). As Daly's credit union business grew, he began to focus on selling to credit unions. (Doc. 96, Tr. 89). Between 2003 and 2011, there was explosive growth in the use of New York Life's OPP Riders. (Plaintiff's Ex. 83, NYL 27819). Daly's credit union customers used the OPP Rider to "dump in" premiums that were often 100 times greater than the annual base premium, or a 100:1 ratio. (Doc. 96, Tr. 114).

In late 2010, New York Life's senior management began to scrutinize more closely the dramatic growth in single premium business. (Doc. 97, Tr. 93-94). Mathas explained that he started to have some concerns about "the risk profile of that business" because of its "unusual liquidity features vis-à-vis our other products, meaning that it really was money that you could put it in and take it out pretty quickly." (Doc. 97, Tr. 94, 97). Mathas shared his concerns with the New York Life's Board of Directors during their November 2010 board meeting. (Doc. 97, Tr. 96-97). Mathas' main concerns were "portfolio drag" and "shock lapse."

Portfolio drag referred to the nature of the investments in New York Life's portfolio. (Doc. 97, Tr. 111). Mathas explained that because interest rates had declined historically, the new money which was brought in by premiums is invested at a rate lower than the rate of the existing portfolio. (Id.) Even though they were only small part of New York Life's overall portfolio, Mathas questioned the wisdom of bringing in credit union OPP rider premiums: "Why on Earth would you want to even take one penny away from all the

other millions of policyholders who are paying their life insurance premiums to protect their families to write business that has a financial risk profile that's questionable?" (Doc. 97, Tr. 207).

Shock lapse refers to the risk of a sudden cash value surrender if interest rates were to rise in the future and OPP policyholders withdrew their money. (Doc. 97, Tr. 107). Mathas explained that if there were mass withdraws, the company would be forced to sell its bonds at a loss to pay the cash surrender values. (Doc. 97, Tr. 107).

Mathas also became concerned about the number of agents doing this type of business. (Doc. 97, Tr. 104). Mathas eventually learned that between January 1, 2010 and July 31, 2011, 1600 agents had sold a single-premium policy with ratios of more than ten-to-one and 458 agents had sold policies which were a hundred-to-one. (Doc. 97, Tr. 103). While Daly accounted for a disproportionate share of the OPP premiums brought in during this time, 70 percent of the total premiums were brought in by other agents. (Doc. 97, Tr. 110). Mathas understood that these changes would have an effect on the income and opportunities for agents. (Doc. 97, Tr. 114). However, Mathas knew that "if we didn't take action soon, it would even have a bigger impact on their income. The more agents that were doing it and the more they were doing this, the more they were establishing a cause of a problem." (Doc. 97, Tr. 114). Mathas also understood that the changes meant the company would be turning away hundreds of millions of dollars in OPP premiums. (Doc. 97, Tr. 120).

Daly was concerned that these changes would hurt his own business. In April of 2010, Daly sent an email requesting a "brief phone call" with Mathas and Mark Pfaff, who was Executive Vice President in charge of New York Life's Agency Department.

4

(Plaintiff's Ex. 36). Daly explained:

> I do not have a New York Life Product that is viable after June 9. I am going to copy you on what send to your guys. I need to expand my supplier network for the first time in my career. I am OK with that and want you to be as well. Life Product thinking seems very out of touch. This is sent from my private email that see right away.
>
> Thanks...Mike

(Id.) Daly also believed that any concerns regarding shock lapse were overstated. Daly explained that his credit union customers had a persistency rate of almost 100 percent because of the high level of service he provided. (Doc. 96, Tr. 130, 136).

Daly was able to provide input regarding the changes to the OPP policies. An email dated April 22, 2010 shows that "in response to some feedback we received from Mike Daly," analysts for New York Life developed a solution for the OPP policies "that both resolved our financial issue and better meets the needs of Mike and his clients." (Plaintiff's Ex. 40). In an email dated September 12, 2010, Pfaff commented: "You've handled Daly's concerns perfectly. Let's keep him dialed in as we bring this home. Perhaps he can be our spokesperson for the roll-out." (Plaintiff's Ex. 70). In addition, Daly was provided with pre-release access to policy illustrations with the new pricing so his business would avoid any interruption. (Plaintiff's Ex. 74).

At some point in November of 2010, Mathas began formulating the idea that the OPP premium ratio should be 10:1. (Doc. 97, Tr. 98, 103). Pfaff's notes from meetings held on November 9, 2010 show there was a recognition that a 10:1 ratio limit on single premium policies would "cut off Daly bus[iness]" and a "10:1 limit . . . kills Daly." (Plaintiff's Exs. 95, 105). However, this change was not implemented at this time. Instead, different changes to pricing and commissions on the OPP policies were made and announced on

November 19, 2010. (Doc. 96, Tr. 138-139). Daly was granted a special exception which allowed him additional time to submit applications for OPP policies. (Doc. 96, Tr. 133). As a result, Daly brought in $123 million in additional OPP premiums under the previous price structure, along with the corresponding commission on that amount. (Doc. 97, Tr. 9).

In the spring of 2011, New York Life created an OPP Pricing Committee to determine what steps could be taken to reduce the risks associated with large OPP dump-ins. Daly served on the OPP Pricing Committee. (Doc. 98, Tr. at 98-99). The Committee developed a plan which was to go in place September 1st. (Doc. 97, Tr. 45). However, according to Mathas, changes in the financial markets and a drop in interest rates in August of 2011 created a sense of urgency. (Doc. 97, Tr. 100-101). On August 17, 2011, Mathas approved the implementation of new limitations on the acceptance of OPP premiums: (a) effective immediately, OPP dump-ins would be limited to $2 million per decision-maker; and (b) for premiums received on or after September 1, 2011, OPP dump-ins could not exceed ten times the standard annual base premium for the underlying whole life insurance policy. (Defendant Ex. 36, at NYL 7045). On August 18, 2011, these changes were explained to Daly and a few other high-performing agents in a telephone conference with New York Life executives. (Doc. 96, at 162). As a result, according to Daly, the plan developed by the OPP Pricing Committee "got vetoed on August 10, that ten months of work, which is Ted's prerogative to veto it. Basically they threw out all the work of the OPP Committee, and he said, 'We're done now.'" (Doc. 97, Tr. 45-46). However, Daly was permitted exceptions and an extension which allowed him to receive another $700,000 in commissions above what he would have earned. (Doc.

97, at 38).

After this Court's ruling on New York Life's dispositive motions, the only claims remaining for bench trial were breach of fiduciary duty and defamation. Daly dismissed his claim for defamation at trial. Therefore, the only claim for this Court to decide is Daly's claim for breach of fiduciary duty under Ohio law.

I.   **ANALYSIS**

New York Life argues that Daly failed to establish that there was a fiduciary relationship or duty between itself and Daly.

The Ohio Supreme Court has defined the term "fiduciary relationship" as one "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Hope Acad. Broadway Campus v. White Hat Mgt., L.L.C.*, 145 Ohio St. 3d 29, 40-41, 46 N.E.3d 665, 676 (Ohio 2015) (quoting *In re Termination of Emp. of Pratt*, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974)). In determining whether a fiduciary relationship has been created, "the main question is whether a party agreed to act primarily for the benefit of another in matters connected with its undertaking." *Id.* (citing *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (Ohio 1988)).

Daly argues that a fiduciary relationship arose out of an informal relationship between himself and New York Life. While a fiduciary relationship may be created out of an informal relationship, "this is done only when both parties understand that a special trust or confidence has been reposed." *Umbaugh Pole Bldg. Co. v. Scott*, 58 Ohio St. 2d 282, 286, 390 N.E.2d 320, 323 (Ohio 1979); *see also Pasqualetti v. Kia Motors Am., Inc.*, 663 F. Supp. 2d 586, 598 (N.D. Ohio 2009) (explaining that under Ohio law, a party cannot

7

unilaterally elevate a relationship to a fiduciary level).

Daly maintains that trust and confidence existed as a result of the strategic partnership formed between himself and New York Life. Daly cites the frequent one-on-one contact between New York Life's top executives and Daly. Daly points out that New York Life sought his opinions and placed special trust and confidence in him because of his superior knowledge and expertise on various issues, especially when it came to selling policies to credit unions. Daly points out that although he was permitted to sell competing life insurance products, he was dedicated to New York Life. Daly explains that after fostering Daly's idea, encouraging the transition of his agency to all credit union clients, promoting his investment in that agency, partnering with him to price the OPP product in 2010, promising him a voice in the design of the 2011 version, and committing to make the new product compatible with his business, Mathas "killed" his business without even talking to him.

However, at trial, Mathas was asked: "Was there anything in your view that was unique about your level or frequency of interaction with Mr. Daly as compared to other high-performing agents?" (Doc. 97, Tr. 71). Mathas responded: "As compared to other high-performing agents and members of the Advisory Board of Directors, no." (Doc. 97, Tr. 71). In addition, Daly does not dispute that New York Life had the right to make prospective changes to its product offerings, including new OPP business after September 1, 2011. (Doc. 96, Tr. 195-96). When it came to these changes, Mathas explained that "I wasn't even thinking about Mike Daly at this time. I was thinking about how I needed to manage this situation to do the right thing for our current and our future policyholders for generations to come." (Doc. 97, Tr. 122). Daly agreed that when it

8

came to economic interests, the policyholders came first. (Doc. 96, Tr. 216).

As a general rule, a fiduciary relationship does not exist between parties negotiating an arm's-length commercial transaction. *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98, 101, 519 N.E.2d 363, 367 (Ohio 1988). The Ohio Supreme Court has explained: "in business transactions where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the other." *Id.*

The Ohio Supreme Court has also held that merely giving advice to another does not create a fiduciary relationship. *Umbaugh*, 58 Ohio St. 2d at 282, 390 N.E.2d at 323. Even though one party to a commercial relationship may "wish for the . . . success" of the other party and "furnish [the other party] with advice in a congenial atmosphere in a sincere effort to help [the other party] prosper," this does not give rise to a fiduciary duty. *Palmer-Donavin Mfg. Co. v. Rheem Sales Co.*, No. 2:14-CV-91, 2014 WL 2767665, at *6 (S.D. Ohio June 18, 2014) (quoting *Umbaugh*, 58 Ohio St. 2d at 282, 390 N.E.2d at 323).

This case involves arms-length transactions between two parties in a commercial relationship. While advice and counseling were exchanged between New York Life and Daly, this did not vitiate the commercial relationship because neither party had, nor could have had, a reasonable expectation that one would act solely or primarily on behalf of the other. *See Umbaugh*, 58 Ohio St. 2d at 282, 390 N.E.2d 320 at 323. It was not reasonable for Daly to expect that New York Life would act primarily on his behalf. While Daly disagreed with the changes New York Life made to the OPP products, Daly acknowledged that when it came to protecting economic interests, New York Life was

9

required to put the policyholders first. Similarly, New York Life did not have a reasonable expectation that Daly would act primarily on its behalf. New York Life was certainly aware that Daly could take his customers elsewhere. Mathas testified at trial that he had a concern that Daly would leave New York Life for another company. (Doc. 97, Tr. 157). Even though Daly's success was linked to New York Life's success (and vice-versa), that does not mean that New York Life had a duty to subordinate its own interests to Daly's interests or act "primarily for the benefit" of Daly. *See Palmer-Donavin*, 2014 WL 2767665, at *6. Moreover, any internal discussions of how the limits on OPP business would have an effect on Daly, is not the same as deciding to limit OPP business in order to "kill" Daly's business. As Pfaff testified at trial:

> Mike and I have been around for a long time. Products change, tax laws change, underwriting changes. The business changes all the time. It doesn't take people out of business.
>
> You adjust, and you move on. . . . Did I think [the changes made in 2011 were] going to change the sales process he was making? Absolutely. But Mike's a pro. What I assumed [he] would do is he would pivot, just as the other people who are selling this product have pivoted since we made the changes.
>
> Q. Are there other agents who make seven-figure incomes selling whole life insurance to clients other than credit unions?
>
> A. Absolutely.
>
> Q. Was there anything you knew about Mr. Daly or the business in 2011 that led you to believe Mr. Daly would not do that as his next step?
>
> A. No. I knew him to be a successful agent before this sales process had been put into place. That was a market that he was working, and the needs of that market still existed along those lines.

(Doc. 98, Tr. 52-53).

Based on the record presented at trial, the Court concludes that there was not a

fiduciary relationship or duty between New York Life and Daly.

## II. CONCLUSION

Based on the foregoing, Defendant New York Life Insurance Company is entitled to judgment in its favor on Plaintiff Michael Daly's claim for breach of fiduciary duty. There being no other matters pending before this Court, this case is **CLOSED** and **TERMINATED** from the active docket of this Court.

**IT IS SO ORDERED.**

                                        */s/ Michael R. Barrett*
                                     JUDGE MICHAEL R. BARRETT